# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~

In re                                                    Chapter 7
**DONALD L. GENZLER**,                                   Case No. 08-17431

       Debtor

~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Trustee's Objection to Debtor's Claim of Exemption (the "Objection") through which the Chapter 7 Trustee, Lynne F. Riley (the "Trustee"), objects to the homestead exemption claimed by the debtor, Donald L. Genzler (the "Debtor"), with respect to the real property co-owned by him and his spouse, Joan Genzler ("Mrs. Genzler") located at 59 Bear Hill Road, Reading, Massachusetts (the "property"). The Debtor filed a Response to the Objection. The issue presented is whether the Debtor intended to occupy the property as his principal residence at the time he declared the homestead in 2008, as required by the Massachusetts homestead statute. *See* Mass. Gen. Laws ch. 188, § 1.

The Court conducted a nonevidentiary hearing on the Objection and Response on February 4, 2009, deemed the matter to be contested, and scheduled an evidentiary hearing to resolve the factual issue of whether the Debtor intended to occupy the

1

property at the time he recorded the homestead. The Court conducted a trial on

November 23, 2009, at which the Debtor and Mrs. Genzler testified and nine stipulated

exhibits were introduced into evidence. At the conclusion of the trial, the Court

inquired of Debtor's counsel why he did not advise Mrs. Genzler, who has resided at

the property since approximately 1992, to be the declarant of the homestead. Counsel

replied that he would not answer the question as he believed a response would violate

the attorney-client privilege, a legal assumption that has a number of flaws, as the

privilege belongs to either the client or the Trustee who did not seek an order

compelling counsel to respond to the Court's question.[1]

Following the trial, the parties each filed post-trial memoranda. Upon

consideration of the documentary and testimonial evidence introduced at trial, the

arguments of counsel and the entire record of proceedings in this case, the Court now

makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.

P. 7052. For the reasons stated below, the Court shall enter an order sustaining the

Trustee's Objection because the Debtor did not validly acquire a homestead exemption

in the property.

## II. FACTS

A. <u>Background</u>

The Debtor and Mrs. Genzler were married in 1971. At some point thereafter,

---

[1] Moreover, the Court observes that the failure to record the declaration of homestead in the name of Mrs. Genzler may have been legal malpractice, an issue which is not before the Court.

2

they purchased the property and lived there together with their three children until approximately April of 1998, at which time the Debtor moved out of the family home.[2] On August 24, 2008, the Debtor and Mrs. Genzler, as Trustees of the Genzler Realty Trust u/d/t/ dated July 30, 1984, deeded the property to the Debtor and Mrs. Genzler as tenants by the entirety for consideration of less than $100. *See* Trustee's Exhibit No. 2. On the same date, the Debtor executed a Declaration of Homestead with respect to the property which bears a recording date of September 8, 2008 (the "Homestead").[3] In his declaration, the Debtor stated: "I own and am possessed and occupy said premises as a residence and homestead under Massachusetts General Laws, Chapter 188 . . . "

On September 30, 2008, three weeks following the Debtor's recording of the Homestead, he filed a voluntary petition under Chapter 7 of the Bankruptcy Code. On page one of the petition, he listed his street address as the property but his mailing address as "2 Neptune Road #102, Boston, MA, 02128."[4] The Debtor filed his Schedules and Statement of Financial Affairs as well as Official Form B22A on the petition date. On his Schedule A - Real Property, he indicated that the property was jointly owned

---

[2] The exact year of the Debtor's departure is unclear as neither the Debtor nor Mrs. Genzler could remember at trial whether he left in April of 1998 or 1999.

[3] The recorded copy of the Declaration of Homestead presented at trial, *see* Trustee's Exhibit No. 3, contains the relevant book and page number but does not bear the name of the recording Registry of Deeds.

[4] The Debtor's voluntary petition, all schedules and statements were introduced by the Trustee as Exhibit 1 at trial.

3

and he valued his ownership interest at $209,750.00,[5] subject to a secured claim of
$261,669.  On Schedule B - Personal Property, he listed, among other items, a 1994 Sea
Ray, 37 foot boat (the "boat"), with a current value of $61,450 as well as a 2000 Dodge
Ram Van valued at $3,075.  On Schedule C - Property Claimed as Exempt, the Debtor
claimed an exemption under Mass. Gen. Laws ch. 188, § 1 in the property and valued
his claimed exemption at $78,915.50.  He also claimed a $375 exemption in his interest in
the van.  On Schedule D - Creditors Holding Secured Claims, the Debtor listed Citi
Mortgage as the holder of two mortgages on the property in the amounts of $84,202 and
$177,467, as well as a secured claim against the boat in the amount of $63,303 held by
Key Bank.   On Schedule F - Creditors Holding Unsecured Claims, the Debtor reported
total unsecured debt of $81,105.00, nearly all of which was credit card debt.

On Schedule I - Current Income of Individual Debtor(s), the Debtor listed only
his gross monthly income from his employment as a driver for Aggregate Industries,
which he reported to be $5,331.00. The Debtor failed to provide information on that
schedule with respect to the income of a "Spouse." [6] In response to Question 17 on
Schedule I, which provides: "Describe any increase or decrease in income reasonably
anticipated to occur within the year following the filing of this document," the Debtor

---

[5] This represents the Debtor's one-half interest in the property as his Schedules C
and D reflect that the property has a total value of $419,500.

[6] As provided in the instructions on Schedule I, "[t]he column labeled 'Spouse'
must be completed in all cases filed . . . by every married debtor, whether or not a joint
petition is filed, unless the spouses are separated and a joint petition is not filed."

answered "None." On Schedule J - Current Expenditures of Individual Debtor(s), the

Debtor listed monthly charges totaling $1,050 for boat related expenses consisting of:

$68 for boat insurance; $611 for boat payment; $38 for mooring permits; $333 for dock

charges as well as $419 for utilities.  He also listed a monthly expense for "Rent or home

mortgage payment" in the amount of $787.00.   Consistent with his reporting on

Schedule I, the Debtor indicated "None" in response to question 19 on Schedule J

regarding increases or decreases in expenditures reasonably anticipated to occur within

a year.

On Form B22A, the Chapter 7 Statement of Current Monthly Income and Means-

Test Calculation, the Debtor indicated that he earned between $4,889.84 and $7,803.58 in

the six month period prior to the petition date and that his average monthly income

during that time was $5,800.64.  The Debtor checked box 2b on the form attesting that

he was "Married, not filing jointly, with declaration of separate households. . . ." The

form provides:

> By checking this box, debtor declares under penalty of perjury: 'My spouse
> and I are legally separated under applicable non-bankruptcy law or my
> spouse and I are living apart other than for the purpose of evading the
> requirements of § 707(b)(2)(A) of the Bankruptcy Code . . . .

The Debtor included only his income on Form B22A for purposes of determining his

eligibility for Chapter 7 pursuant to the means test.

Two months after filing his petition, on December 1, 2008, the Debtor filed an

amended Schedule B and C to amend only the value of his van and the corresponding

exemption.  The Debtor has not otherwise amended his schedules or statements to date.

On October 30, 2008, the Trustee conducted the § 341 meeting of creditors. At the meeting, while under oath, the Debtor testified that he reviewed his petition, schedules and statements before signing them and that they were true and accurate.  *See* Trustee's Exhibit 8 at pp. 2-3. When asked whether he still lived at 2 Neptune Road, Number 102 in Boston, he testified that that address was a post office box where he received his mail, clarifying that "I live on a boat."  Id. at 3.  He explained: "I live on the water so there's no address on the water. . . 102 is the box number."  Id. at 3-4.  The Trustee inquired about the property:

> Q:    Now on your schedule of real property, you disclose property at 59 Bear Hill Road in Reading.  You don't live at this residence?
>
> A:    No, I don't.
>
> Q:    You don't. Where do you live?
>
> A:    On the boat.
>
> ***
>
> Q:    Who lives at Bear Hill Road in Reading?
>
> A:    My wife lives there.

Id. at 4.  The transcript from the § 341 meeting reveals that at that point, Debtor's counsel explained that the Debtor was not divorced from Mrs. Genzler.  Id. at 5.  The Debtor testified that he and Mrs. Genzler had been separated since the spring of 1998.  Id.  The Trustee inquired further:

> Q:    [W]hen was the last time you actually slept at the Reading Property?
>
> A:    April of 1998.
>
> Q:    That's the last time you spent a night there?
>
> A:    Yes, I haven't been back since I left.
>
> Q:    Do you keep any property at the residence?
>
> A:    No.

Id.  The Debtor testified that he recorded the Homestead in his name, and his counsel interjected that "He's intending to go back *if* they get back together *or if* she were to pass away."  Id. at 7 (emphasis added).  Later during the examination, the Debtor reiterated his prior statements:

> Q:    Do you occupy said premises, sir?
>
> A:    No, I don't. I live on a boat.
>
> ***
>
> Q:    And you live on this boat - - you've lived on this boat for eleven years?[7]
>
> A:    Yes, I have.  Different boats . . .

Id. at 7 and 12.   At the § 341 meeting, members of the Office of the United States Trustee's also questioned the Debtor about his filing of joint tax returns with Mrs. Genzler.  The Debtor elaborated further about his living situation:

> My wife and I are - - we're separated over our children basically, and I haven't

---

[7] This question was asked by a member of the United States Trustee's office.

been back for ten years and I just pay her $787 a month because she can't afford the Reading house.

So I live on the boat and we stay the way we are because of insurance basically. She has no insurance so I - - we stay just the way it is now so she can have health insurance. She's never done anything to me. It's just our children divorced - - separated us.

Id. at 10. In all, the Debtor testified at least five times during the § 341 meeting that he lived on the boat and not at the property. Not once did he indicate, other than through the statement of his counsel, that he intended to move back to the property.

Also at the § 341 meeting, the Trustee questioned the Debtor about the $787 monthly rental/mortgage expense listed on his Schedule J, and he testified that he has paid that amount every month to Mrs. Genzler for the past eleven years with respect to mortgages on the property which she is unable to pay herself. Id. at 8-9. He testified that he has no support obligation to her but that he previously paid child support when his children were living at home. Id. The Debtor also testified that his utility invoices, which are all billed to his address at Neptune Road, are for utility services he receives on the boat including electricity, cable and internet. Id. at 13-14.

Based upon the Debtor's testimony at the § 341 meeting, the Trustee timely filed the Objection on November 13, 2008, asserting that the Homestead was improperly claimed by the Debtor because he did not occupy the property on the date he declared the Homestead. The Debtor filed a Response on December 16, 2008 in which he substantially revised the factual statements made at the § 341 meeting. He abandoned

the prior statement of his counsel that he intended to return to the property if his wife

died or if the couple reconciled and replaced it with an unqualified intention to return:

> Once the Debtor made the decision to file for bankruptcy, he understood
> and planned that he and his wife would have to transfer the property out
> of the Genzler Realty Trust and Deed it to themselves and have the Debtor
> place a Homestead on the property *with the intent to move back into the*
> *residence and make it his principal residence.*

Debtor's Response at ¶9 (emphasis added).    Additionally, the Debtor stated in the

Response that he "has gone over to the house an average of three times a week since the

initial separation. . . ," and "also stores some of his belongings [there,]" Id., all in direct

contradiction of his § 341 meeting testimony.  He also stated that he, in fact, did move

back to the property in early November so that his family would not have to bear the

burden of his debts incurred while he was living on his own. Id.  The Debtor suggested

that this new information was reconcilable with his prior testimony because: "He was

never asked [at the § 341 meeting] if he intended to reside [at the property] at the time of

his filing of the Homestead . . . [nor was he] asked if he had ever been back to the

property or performed all of the maintenance on the property . . . since the separation. "

Id. Lastly, the Debtor added that his schedules were accurate at the date of filing but that

he would amend his petition if his expenses changed. Id. at ¶10.

    B. Trial Testimony

    The Debtor and his wife were the only witnesses to testify at trial.  The Court

allowed the Trustee's oral motion to sequester them during testimony. At trial, the

Debtor's version of events changed again, sometimes from minute to minute.

The Debtor testified that he and his wife married in 1970 or 1971 when he was eighteen years old and she was fifteen years old, Tr. at 50-51, and that the couple had three children, although he could not be sure of their ages. Id. at 5.  The Debtor and Mrs. Genzler purchased the property in 1986.  Id. at 6. In April of 1998 or 1999, again the Debtor could not remember which year,[8] the Debtor left the property and moved onto a boat, Id. at 6, 47.  He testified that he left home following a major family dispute which resulted when one of the couple's daughters became pregnant out of wedlock. Id. at 29, 32, 54, 55.  He explained that the situation created chaos in the family, that he and his wife took opposing sides in the matter and that he moved out of the property to diffuse some of the conflict.  Id. at 29, 30, 55, 56.

The Trustee showed the Debtor a copy of the Homestead, recorded on September 8, 2008, in which he declared that he occupied the property.   See Trustee's Exhibit 3.[9] When asked if he did, in fact, occupy the property when he attested to the declaration, the Debtor replied: "Yes.  I don't know if I moved in before or after but I was in the process of moving when we Homesteaded it." Tr. at 34. When asked by the Trustee

---

[8] The Trustee also produced at trial the Debtor's "Responses to the Chapter 7 Trustee's First Request for Interrogatories" in which he stated that he had left the property in April of 2000. Id. at 47-48.

[9] The Trustee also introduced Exhibit 4, the Debtor's Earnings Statements for portions of the first four months of 2009, Exhibit 5, the Debtor's bills from the Winthrop Yacht Club, Inc. dated December 6, 2007 and December 8, 2008, Exhibit 6, the Debtor's bill from Boston Bay Marina, Inc. dated April 18, 2008, and Exhibit 7, copies of checks written by the Debtor to various payees for boat related expenses.

where he lived on the petition date, September 30, 2008, the Debtor replied that he lived on the boat, Id. at 7, and was not living together with his wife on that date.  Id. at 20. Later, he said that he was "in the process of moving in or talking to my wife about coming back" on the petition date.  Id. at 34.  When questioned by his own attorney, he definitively stated that he was living on the boat at the time of the bankruptcy filing.  Id. at 61.

The Debtor testified that at the time of the § 341 meeting, which was held on October 30, 2008, he and Mrs. Genzler were in the process of moving back in together, contradicting his sworn testimony at the § 341 meeting.  Id. at 41, 46. Later, when examined directly by the Court, he said that "by October, I was living [at the property] seven days a week. . . ." Id. at 71, *see also* Id. at 63.  On later examination, Debtor's counsel attempted to rehabilitate his client's testimony by asking him whether he was certain of the dates he returned to the property and whether or not his return date was before or after the § 341 meeting.  The Debtor responded that he was not sure of the dates and that he moved back to the property "before and after [October 30, 2008], one or two days here, one or two days there, just trying it out." Id. at 77-78.

Despite the Debtor's prior representations at the § 341 meeting that he had not been back to the property for ten years, he testified at trial that he actually started to visit his family at the property approximately five or six years ago[10] for family functions and

---

[10] This statement contradicts the Response in which the Debtor stated that he "has gone over to the house an average of three times a week since the initial separation. . ." Response at ¶9. It is also contrary to his § 341 meeting testimony.

11

holidays, Id. at 46, that he has his own keys, Id. at 66, and that he stored a number of personal items there.   Id. at 17, 44. The Trustee confronted the Debtor about his contradictory testimony at the § 341 meeting during which he said that he had not been back to the property since 1998 and did not store any belongings there.   *See* Trustee's Exhibit 8.   When asked if his § 341 testimony had been truthful with respect to these matters, the Debtor said "no." Id. at 44-46, *see also* Id. at 77.   He elaborated: "My wife asked me to keep her out of this completely, and I did this to protect my family and my wife." Id. at 45.  He added, "I was protecting my wife and my house. . . ." Id.

The Trustee inquired whether, at the time he signed his petition, schedules and statements, he planned to return to the property.  The Debtor responded: "Yes," Id. at 30, and that he intended to do so in "August of 2008, September of 2008, right around the fall." Id. The Trustee asked the Debtor to review the bankruptcy documents, all signed by him under the penalties of perjury.  Specifically, she directed his attention to his Schedule I as well as Form B22A in which he did not report Mrs. Genzler's income, which he said was approximately $51,000 a year.  The Debtor testified that he did not include her income because "[w]e weren't living together at that [petition] date. . . " and had not been living together for over ten years, Id. at.   20, a statement he later undermined when he said he was intending to move back into the house at the time he signed the petition and schedules, Id. at 30, and was "in the process of moving in or talking to my wife about coming back to the [property]" on the petition date.  Id. at 34.

When asked by the Trustee why he reported "None" in response to Question 17

12

of Schedule I, the Debtor said he did so because there were no changes "he had any

control over." <u>Id</u>. at 24.  He testified that $1,400 of the living expenses he disclosed on

Schedule J, including expenses for a boat loan payment, boat insurance, docking and

mooring fees and all utilities, were expenses related to his life on the boat, <u>Id</u>. at 27,

which was now in storage. <u>Id</u>. at 28.  When asked whether moving off the boat would

eliminate most of his expenses on Schedule J, he replied "Not all of them but a lot of

them."  <u>Id</u>. at 29.  When asked by the Trustee why he did not report any reasonably

anticipated decreases in his expenditures in response to Question 19 on Schedule J, the

Debtor answered with a nonresponsive: "I had no idea the economy was gonna go like

this . . ." <u>Id</u>. at 29. The obfuscation continued:

> Q:    And yet you stated in Question 19 you foresaw no circumstances
>       that would cause your expenses to change over the course of the
>       next year, didn't you?
>
> A:    How would I know the Boston construction industry would come to
>       a standstill? I had no way of knowing that.
>
> ***
>
> Q:    And you didn't seek to correct anything with regard to your
>       schedule of income or your schedule of expenses, did you?
>
> A:    You mean my income coming to an end?  Is that what you're asking,
>       did my income stop or --
>
> Q:    [Was there] any change to your income over the course of the
>       following year or your expenses?
>
> A:    Yeah, I had no way of knowing.

<u>Id</u>. at 31 and 41.

13

The Debtor was questioned by the Trustee, his own counsel and the Court regarding when he decided to return to the property. A precise answer to that question, however, proved to be elusive. Indeed, the Debtor was vague and indefinite in his story. The Debtor's constant refrain during the trial was that he "always" intended to return to the house. *See* Id. at 21 ("[I] always knew I would be going back."); Id. at 24 ("I am always going to move back into my house. I never, ever not going to move back into that house."); Id. at 25 ("Never could we stay apart."); Id. at 28 ("I always intended to move back to the house, always."); Id. at 29 (" I never, ever, ever would walk away from my wife and my house."); Id. at 30 ("I was always going to move back to my house."); Id. at 32 ("There's no way that we would ever stay apart for the rest of our lives."); Id. at 57 ("There was no way my wife and I would ever be apart forever."). When pressed for specific dates, the Debtor hedged:

Trustee:      And when were you intending to move back to your house?

Answer:      August of 2008, September of 2008, right around the fall.

Id. at 30. When asked the same question by the Court, the Debtor replied: "the end of August, early September [of 2008.]" Id at 74.

The Debtor also testified at length about his financial difficulties which led him to file a bankruptcy petition and the decision to return to the property. According to the Debtor, his work began to "slow down" in mid-2008, a few months prior to the

bankruptcy, Id. at 74.[11] He stopped paying his credit card bills in 2007, a year or less prior to the bankruptcy, when the interest rates on the cards were raised from seven to 33 percent, Id. at 62 and 68. Also, the tenant who had rented an apartment at the property vacated it in the fall of 2009, more than a year after the bankruptcy. Id. at 23. The Debtor described his current work status as a union cement truck driver, working on a day-to-day basis if he receives a call from his employer the prior evening. Id. at 60. He said that he was essentially laid off two or three weeks prior to trial, Id. at 73, and is collecting unemployment compensation to supplement his limited per diem work. Id. at 61. At other times during the trial, he stated that he has "no income" and that he is "out of work." Id. at 26, 28-29, 32, 71, 76. The Debtor explained that he always intended to return to the property and that his final decision to do so was necessitated by his financial crisis which coincided with an improvement in his family's emotional condition:

> We had to get back together to survive. . . I'm in the construction business and the whole world is falling down in the construction business. I'm sitting home on unemployment right now. My wife makes 50 to 51,000 a year, she's drowning, I'm drowning. We moved back in, in 2008 to survive. That's the only way we can survive. There's no other way.

> ***

> Time healed the family emotional problem that we had in 1998. Time

---

[11] Despite the Debtor's description at trial of a work slow down in 2008, he reported fluctuating income in his Form B22A for the six months preceding the bankruptcy from a low of $4,889.84 in July of 2008 to a high of $7,803.58 in May of 2008. He reported his monthly income in August of 2008, the month prior to the bankruptcy filing, at $5,666. *See* Exhibit 1.

healed that, and . . . then work started to get slower and slower and I had no income, and then I talked to my wife, because things were getting better, to move back in, and she agreed.

Id. at 25, 76.

The Trustee questioned the Debtor about the timing of events:

Q:     Sir, isn't it true that in 2007 your joint household income was over $100,000?

A:     . . . Yeah, my wife was 51, and I was 50 –$100,000.

Q:     So in 2007 when you stopped paying your credit cards, you had joint household income of over $100,000?

A:     Yes.

Id. at 68.

Q:     Sir, isn't it true that in the six-month period prior to your filing you were making an average of $5,200 to $7,800 each month?

A:     Yes.

Q:     And on the date you filed your petition . . . you indicated in your schedule [of] income you made an average of $5,300 a month, and you anticipated no change in that income over the following year?

A:     I had no idea what my income would be for the following year.

Id. at 69.

When examined by his own counsel, the Debtor emphasized his continued connection with the property during his separation.  He described his departure as a "cooling off period"   Id. at 57, 70, and that notwithstanding his separate living arrangements for ten years, he contributed both time and money to the upkeep of the

16

home, Id. at 58, visited the property frequently, Id. at 63, and had his laundry done there

as well.  Id. at 67. This testimony was in direct conflict with his § 341 testimony.

To address inconsistencies between the Debtor's trial and § 341 meeting

testimony, and despite the Debtor's admission that he gave false testimony at the § 341

meeting, his counsel attempted to attribute the discrepancies to semantics:

> Q:      You were asked [at the § 341 meeting about] . . . the last time you spent the
> night [at the property]. . . And you indicated [then] 'Yes, I haven't been
> back since I left.' . . . And that was in response to the question [regarding]
> when you had spent the night there. . . You weren't indicating you've
> never been back to  the property since then.
>
> A:       No. [I was indicating] when I [last] slept there.
>
> Q:      At any point in [the § 341 meeting] transcript or any point during the 341
> meeting, to the best of your recollection, were you ever asked if you were
> intending to live at the Reading property?
>
> A:      No.

Id. at 65-65.

When the Court questioned the Debtor about his decision to be the declaring

party on the Homestead, he replied: " I didn't want to lose my house over this . . . that's

all I have, is this house." Id. at 73.

Mrs. Genzler also testified at the trial, and she generally supported her husband's

statements that he intended to eventually return to the property.  She said she also

considered his departure from the property to be a cooling off measure, and she

expected him to return within a "year or two" because she thought and hoped that they

could work through their family issues.   Id. at 81-82, 87.   During the ten years of

17

separation, she testified, she never considered getting a divorce because "[w]e always wanted to work on getting things back together. . ." Id. at 88.

According to Mrs. Genzler, the Debtor did not return to the property during the early part of the separation, but he did contribute financially toward the mortgage payment and for one of their children's schooling. Id. at 82-83. Based upon her annual salary of approximately $50,000, she testified, she could not afford to pay the property's expenses by herself. Id. at 84. She helped him purchase the boat and is jointly liable with him on the purchase money loan secured by the boat. Id. at 86-87. In 2008, they had discussions about moving back in together because they both were in a "financial bind" and because they were trying to work out their differences  Id. at 87.

When asked by the Trustee about when the Debtor began spending nights back at the property, Mrs. Genzler replied that it was in September of 2008 and that he was probably spending four nights a week at the property during September and five to seven nights a week during October. Id. at 89-90. She also added that recent events, including the death of close family members have had an adverse effect on her memory and ability to remember exact dates. Id. at 90-91.

When the Court questioned Mrs. Genzler, she replied that she and the Debtor first discussed his return to the property in August or September of 2008. Id. at 92. When asked whether he moved back for financial reasons or purposes of reconciliation, she replied "both." Id. at 94. When asked about her response to the Debtor's planned bankruptcy filing, she replied: "I told him to do what he had to do but just to make sure

18

that I was protected, and the home was protected[,]" and that she asked him "not to do

anything that would hurt myself or - - the home. . ." Id. at 86.

## III. POSITIONS OF THE PARTIES

A. <u>The Trustee</u>

The Trustee argues that there are essentially two plausible versions of events in

this case.  The first version is that the Debtor lived on the boat on the date he declared

the Homestead and intended to continue to live there while his wife remained at the

property.[12]  That version, which is substantiated by the information provided by the

Debtor in his petition, schedules and statements and at the § 341 meeting, supports the

Trustee's Objection.  The second version is that the Debtor formed an intent to return to

the property in August or September of 2008 and actually returned to the property

between September and November of 2008.   That version is supported by the Response

to the Objection and most of the Debtor's and his wife's trial testimony.  According to

the Trustee, the latter version is dubious and contrived as it was formulated only after

the Trustee filed her Objection and the Debtor realized that he had misapprehended the

legal requirements for filing a valid homestead under Mass. Gen. Laws ch. 188.

Therefore, she argues, the Debtor incorrectly believed that the property was protected at

the time he signed his petition documents and testified at the § 341 meeting and that his

motivation to submit untruthful testimony did not arise until after she filed the

---

[12] This view is partially supported by portions of the Debtor's trial testimony.  *See*
Tr. at 20.

Objection and the homestead was in jeopardy.

The Trustee maintains that the only credible evidence supporting the Debtor's intention to return to the property, i.e., that he had no intention to occupy on the date he recorded the Homestead, was adduced before she filed the Objection.  She contends that the Debtor's trial testimony to the contrary was not credible and that the motivation for his false trial testimony was a desire to protect the property, a sentiment expressed by both witnesses at trial.

B.    The Debtor

The Debtor filed a post-trial brief in which he definitively conceded that at the time of the recording of the Homestead he did not reside at the property.  Debtor's Brief at p. 2.  He asserts that the Trustee failed to satisfy her burden proof and that she has produced no evidence that shows at the time he filed his homestead declaration, he did not intend to occupy the property. Id. at p. 3.  He contends that he clearly established at trial that he always intended to return to the property and that none of the exhibits or trial testimony support the Trustee's assertion that the Homestead was invalid.   Indeed, he argues that the petition, deed and Declaration of Homestead, see Exhibits 1-3, and his actual return to the property establish his ultimate intent to occupy the property when he filed the Declaration.  Moreover, the Debtor contends that the deed and Homestead were publicly recorded at the Registry of Deeds and constitute "physical" evidence of his intent.  Alternatively, the Debtor argues that should this Court find that the Trustee met her initial burden of proof, the Debtor has unequivocally demonstrated at trial that

20

the Homestead was valid because of his meaningful connection to the property during

the separation from his wife, citing the factors discussed in In re Tofani, 365 B.R. 338

(Bankr. D. Mass. 2007) .

With respect to his § 341 meeting testimony, the Debtor maintains that he made a

number of misstatements at the meeting concerning his involvement with the property,

but that the Trustee did not ask him any questions regarding his future intent to occupy

the property "at anytime after the [§] 341 meeting." Id. at p. 4.   Lastly, the Debtor argues

that Mrs. Genzler's occupation of the property at the time of the declaration is sufficient

to defeat the Trustee's objection, citing In re Webber, 278 B.R. 294 (Bankr. D. Mass. 2002).

## IV. DISCUSSION

Pursuant to the Massachusetts Homestead statute,

An estate of homestead to the extent of $500,000 in the land and
buildings may be acquired pursuant to this chapter by an owner or
owners of a home or one or all who rightfully possess the premise by
lease or otherwise *and who occupy or intend to occupy* said home as a
principal residence.

Mass. Gen. Laws ch. 188, §1 (emphasis added). "The statute contains the explicit

requirement that in order to claim an estate of homestead in land and buildings the

debtor must either occupy *or* intend to occupy the property as the principal residence."

In re Edwards, 281 B.R. 439, 446 (Bankr. D. Mass. 2002); *see also* In re Tofani, 365 B.R. 338,

345 (Bankr. D. Mass. 2007)("If the Debtor neither occupied nor intended to occupy the

Residence at the time of his declaration, then the homestead was not acquired validly

and could not be the subject of an exemption claim in his bankruptcy case. . . ."). The operative date for determining the validity of the homestead for purposes of occupation or intent to occupy is the date the declaration is recorded.  In re Marrama, 307 B.R. 332, 337 (Bankr. D. Mass. 2004); *see also* In re Roberts, 280 B.R. 540, 547 (Bankr. D. Mass. 2001)("[U]nder Massachusetts law, the Debtor has failed to demonstrate that he was entitled to an estate of homestead because he neither occupied nor intended to occupy the Premises at the time he filed the declaration.").

Pursuant to Fed. R. Bankr. P. 4003(c), the burden is on the trustee as the objecting party to prove the homestead is not properly claimed.[13] *See also* Shamban v. Perry (In re Perry), 357 B.R. 175, 178 (B.A.P. 1st Cir. 2006). This rule reflects the Code provision making a debtor's properly listed exemptions presumptively valid. *See* 11 U.S.C. § 522(l).[14] If the objector introduces evidence effectively challenging the exemption, the

---

[13] The Rule, in part, provides:

c) Burden of proof. In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections.

Fed. R. Bankr. P. 4003(c).

[14] The statute provides, in part:

(l) . . . Unless a party in interest objects, the property claimed as exempt . . . is exempt.

11 U.S.C. § 522(l).

22

burden shifts to the debtor to produce evidence in support of his claim. In re Toppi, 378 B.R. 9, 11 (Bankr. D. Me. 2007), *as amended* (Nov. 15, 2007). *See also* In re Roberts, 280 B.R. at 544-45 ("'If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. . . the burden of persuasion, however, always remains with the objecting party.'")(quoting Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 (9th Cir. 1999)).

The question is whether the Trustee produced sufficient evidence at trial to rebut the validity of the Debtor's Homestead exemption and, if so, whether the Debtor produced sufficient evidence to demonstrate that the exemption was proper. There is no dispute that the Debtor did not live at the property at the time he recorded the declaration in August of 2008. *See* Debtor's Brief at p. 2. The issue is his intent to occupy the property. The meaning of "intent to occupy" has been interpreted by a number of courts in this district. *See* In re Tofani, 365 B.R. 338, 345 (Bankr. D. Mass. 2007), discussed *infra*; In re Webber, 278 B.R. 294, 298 (Bankr. D. Mass. 2002)("Specific intent . . . is hidden in the mind of the homestead owner, may not be clear even to him or her, and can change back and forth; it often leaves no public record of itself."); In re Roberts, 280 B.R. 540, 546 (Bankr. D. Mass. 2001)("[I]n order to establish the requisite intent, a debtor must demonstrate that the future occupancy is in the near future and is capable of measurement given whatever steps a debtor must take to achieve occupancy. A declaration of interest alone is insufficient."). *See also generally* In re Edwards, 281 B.R.

23

439 (Bankr. D. Mass. 2002).

The Massachusetts homestead exemption is to be liberally construed in favor of the declarant. Shamban v. Masidlover, 429 Mass. 50, 53, 705 N.E.2d 1136, 1138 (1999); Dwyer v. Cempellin, 424 Mass. 26, 30, 673 N.E.2d 863, 866 (1996). Even a liberal construction of the statute, however, cannot help the Debtor who has provided the Court with conflicting and ambiguous versions of his intent and events and admittedly inconsistent statements and false testimony. The Debtor's trial testimony belied the income and expenses he reported in his schedules and Form B22A and plainly contradicted statements made at his § 341 meeting. He never satisfactorily explained why he did not include his wife's income on his Form B22A, or why he failed to amend his schedules after his living situation changed or how events which happened in 2009, such as the loss of his job and the loss of the tenant, contributed to an intent to return to the property in September of 2008. Likewise, he had no explanation for signing a Declaration of Homestead in which he declared that he occupied the property at a time when he categorically did not. His trial testimony was marked by stark inconsistencies and evasive answers. While he credibly testified about the events which led to the estrangement from his wife, his testimony concerning critical dates, which are the crux of this matter, was not credible given the varied answers he gave to identical questions over the course of the trial and this case. His memory was clearly faulty at times with respect to certain basic matters, and in several instances he appeared not to grasp the significance of certain questions or the critical nature of his answers, in particular his

24

admission of giving false testimony at the § 341 meeting. At other times, when questioned by his own counsel, he appeared to be working from a rehearsed script.

In short, the Debtor's trial testimony was a morass of varying statements in which he alternated between moments of candor, obfuscation and deceit. Nonetheless, he would ask this Court to believe his trial testimony and disregard the sworn statements he made in his petition, statement and schedules as well as the § 341 meeting. The Debtor has not given the Court cause to do so, and it is compelled to conclude that the Debtor would, and did, say anything in the hopes of protecting the property from the reach of creditors.[15] Thus, the full truth surrounding the timing and reasons for the Debtor's return to the property remains unknown. Mrs. Genzler's testimony, which also lacked specificity concerning crucial dates, did nothing to convincingly corroborate the Debtor's intent to return to the property at the time he recorded the Homestead.

The Court finds the Debtor was not a credible witness at trial. The Trustee should

_____

[15] Ironically, the property is protected, to an extent, by the fact that the Debtor and Mrs. Genzler own it as tenants by the entirety. *See* Mass. Gen. Laws ch. 209, § 1 which proves, in part:

> [T]he interest of a debtor spouse in property held as tenants by the entirety shall not be subject to seizure or execution by a creditor of such debtor spouse so long as such property is the principal residence of the nondebtor spouse. . .

Mass. Gen. Laws ch. 209, § 1.

The Trustee succeeds to the Debtor's interest, subject to his wife's right to occupy the property and her right of survivorship.

be entitled to rely on the Debtor's schedules and testimony at the § 341 meeting concerning his relationship with and connection to the property and Mrs. Genzler, copies and transcripts of which were all introduced by the Trustee as evidence at trial.[16] Accordingly, the Court finds that the Trustee introduced sufficient evidence at trial to establish that at the time of the recording of the Homestead the Debtor neither occupied nor intended to occupy the property as his principal residence.   The Debtor's trial testimony did not constitute unequivocal evidence demonstrating the validity of the exemption as such testimony was, for the most part, contradictory of earlier sworn statements, vague and equivocal concerning the timing of his intention to return. To find otherwise would sanction the Debtor's false statements, whether they occurred before or during the trial or both.   Further, it would also sanction the Debtor's scheme to shield his property from creditors, a scheme he need not have resorted to had his wife simply been the declarant of the Homestead.

The Debtor's arguments to the contrary are unavailing.   The Debtor's reliance on In re Webber, 278 B.R. 294 (Bankr. D. Mass. 2002), is misplaced. In that case, the debtor filed a declaration of homestead on the marital home on September 8, 1999, at a time when he and his wife occupied the property as their primary residence. Id. at 295.

---

[16] *See* Havis v. AIG Sunamerica Life Assurance Co. (In re Bossart), No. 05-34015-H4-7, 2007 WL 4561300, at *10  (Bankr. S.D. Tex. Dec. 21, 2007), *aff'd* 389 B.R. 511 (S.D. Tex. 2008), *aff'd* 296 Fed. Appx. 398 (5th Cir. 2008)("[I]t is not the Trustee's job to play connect-the-dots with the Debtors' schedules and [statement of financial affairs]. It was the Debtors' duty to make as full and complete a disclosure as possible. The three most important words in bankruptcy are: disclose, disclose, disclose."(citing In re Sanchez, 372 B.R. 289, 305 (Bankr.S.D.Tex.2007))(footnote omitted).

Twenty days later, the debtor's wife obtained a restraining order compelling the debtor to vacate the property.  Id.  The Chapter 7 trustee contended that the debtor's estate of homestead, although initially valid when declared, lapsed when he left the property. The issue before the Court was whether a homestead exemption can be terminated by abandonment:

> [E]ven if the continued validity of an estate of homestead were contingent on the continuing satisfaction of the occupancy requirement, the requirement would be more faithfully construed as applying to the family, not just to the owner that holds the homestead.
>
> ***
>
> [I] conclude that either (1) the continuing validity of a Massachusetts estate of homestead is not contingent on the holder's *continued* occupancy or intent to occupy or (2) if the validity of such an estate requires *continuing* occupancy or intent to occupy as a principal residence, the requirement is satisfied if the holder's spouse and minor children continue to occupy the premises as their principal residence.

Id. at 298-99(emphasis added).  Unlike the instant case, the debtor's homestead in Webber was initially valid when declared as he occupied the property on the operative date.  The Court determined that to the extent that an estate of homestead requires "continuing occupancy or intent to occupy" that requirement can be fulfilled if the holder's spouse continues to occupy the premises.  Here, the Debtor did not satisfy the occupancy requirement of Mass. Gen. Laws ch. 188, §1 on the recording date, and, thus there can be no "continuing validity" of the Homestead through Mrs. Genzler's occupation. Had the Debtor intended to rely on his wife's occupancy of the property, they should have arranged for her to be the declarant of the Homestead.

27

<u>In re Tofani</u>, 365 B.R. 338 (Bankr. D. Mass. 2007), another case relied upon by the Debtor, is also unavailing.  In that case, the court addressed a factual scenario similar to the instant case in which the debtor filed a declaration of homestead on September 27, 2005 on real property owned by him and his ex-wife, in which he stated that he owned the residence and intended to occupy it as his principal residence.  <u>Id</u>. at 341.  The debtor did not occupy the property on the date he recorded the declaration and had not lived there since 2001 due to the couple's divorce.  The debtor claimed that he intended to resume occupancy of the residence by acquiring his ex-wife's interest.  <u>Id</u>. The court examined the debtor's intent to occupy the residence at the time of the declaration: "As in other areas of the law, intent, though elusive, may nonetheless be discerned in and, established by, words and actions divined for their true meaning rather than their facial form." <u>Id</u>. at 345.  The court found that the debtor had the requisite intent to occupy the residence when he made his declaration:

> I find this intent reflected in his strong and continuing connection to the Residence arising from his co-ownership, his maintenance and improvement obligations, his close relationship to his children including regular visitations with them at the Residence, and *their* uninterrupted occupancy of the Residence.

<u>Id</u>. at 346 (emphasis in original).  Notably, the Court considered that the debtor "testified consistently and credibly that, in making the homestead declaration, he intended to re-occupy the Residence at a future date and in any case sought to provide to his children the homestead protections available as to the Residence under the statute."

Id. at 345.   To the extent that Tofani was determined based upon the Debtor's credible testimony concerning his intention to return to the residence, it is distinguishable from this case where the Debtor's testimony regarding his connection to the property was inconsistent and incredible.   Indeed, the determination of the Debtor's intent in this case has proven to be completely elusive and the true meaning of his words and actions impossible to discern.

Next, the Debtor contends that the § 341 meeting transcript, see Trustee's Exhibit 8, "contains no questions or answers regarding the Debtor's future intent towards occupying [the property] as his principal residence at anytime after the 341 meeting." Debtor's Brief at p. 4.  This statement is not only an incorrigible attempt by the Debtor to salvage a reconciliation between his trial and § 341 meeting testimony, but it also reflects the Debtor's continued misapprehension of the legal requirements for a properly claimed homestead under Mass Gen. Laws ch. 188, § 1.  "[T]he Debtor's future intent is irrelevant because the Massachusetts homestead statute is phrased in the alternative, creating a valid estate of homestead where the Debtor occupies or intends to occupy the property as his principal residence."  In re Edwards, 281 B.R. at 450 (emphasis added).

Lastly, the Court discounts the significance of the Debtor's current occupancy of the property,[17] as a demonstration of the Debtor's intent to return on the date he recorded the Homestead.  The Debtor offered various dates through pleadings and testimony for his eventual return to the property, ranging from August through

---

[17] This fact does not appear to be disputed by the Trustee.

November of 2008.  The Court finds it likely that the Debtor's decision to return to the property arose well after the date he recorded the Homestead.  The Debtor made repeated references at trial to the fact that the couple had to move back in together because they were "drowning" financially.  *See* Tr. at  25, 46, 63, 69, 71, and 74.  Two of the motivating factors for the Debtor's return, a work lay off and a tenant vacancy, postdated the recording of the Homestead as well as the bankruptcy filing.  A third consideration, high credit card bills, would have been eliminated through a bankruptcy discharge.  The Debtor offered the Court no definitive or credible testimony concerning the actual date he intended to return and, without more, the Court cannot rely on his repeated assertion that he "always" intended to get back together with his wife as the unequivocal evidence required to determine the Homestead was validly claimed. *See* Roberts at 544-45.  To the extent that Mrs. Genzler agreed with the Debtor's recently contrived position, the Court finds her testimony incredible. Based upon the length of the couple's separation and the Debtor's testimony at the § 341 meeting, the Court concludes that the couple never divorced for reasons related to insurance rather than a hope of future reconciliation.  The Debtor's contention that his publicly recorded Homestead constitutes physical evidence of his intent to return is absurd as the declaration contains no reference to the Debtor's intent to occupy the property and contains nothing more than the false statement that he occupied the property.

**V. CONCLUSION**

For reasons the stated above, the Court shall enter an order sustaining the
Trustee's Objection to the Debtor's Claim of Exemption.

By the Court,

_____

Joan N. Feeney
United States Bankruptcy Judge

Dated: March 31, 2010

cc: Lynne F. Riley, Esq., Joshua Spirn, Esq.